2012 CO 68

GENERAL STEEL DOMESTIC SALES, LLC, d/b/a General Steel Corporation, a Colorado limited liability corporation; Discount Steel Buildings, LLC, a Delaware limited liability corporation; Jeffrey Wayne Knight, individually; and Nathan Wright, individually, Petitioners,

v.

Harold Irving BACHELLER, III, Respondent.

No. 10SC403.

Supreme Court of Colorado, En Banc.

Nov. 27, 2012.

As Modified Dec. 20, 2012.

Building Services Group, LLC, Patrick D. Frye, David S. Fein, Littleton, Colorado, Attorneys for Petitioners.

Clisham, Satriana & Biscan, LLC, Daniel R. Satriana, Jr., Denver, CO, Attorneys for Respondent.

Professor George W. Pring, Golden, Colorado, Lori J. Potter, Kaplan Kirsch & Rockwell LLP, Elizabeth R. Cross, Hayes, Phillips, Hoffman & Carberry P.C., Denver, Colorado, Attorneys for Amicus Curiae.

Chief Justice BENDER delivered the Opinion of the Court.

¶ 1 In this appeal, we review the court of appeals' unpublished decision in *Bacheller v. General Steel Domestic Sales, LLC*, No. 09CA1383, 2010 WL 1611081 (Colo.App. Apr. 22, 2010) (not published pursuant to C.A.R. 35(f)), to determine the applicability of *Protect Our Mountain Environment, Inc. v. District Court*, 677 P.2d 1361 (Colo.1984) ("*POME*") to this case and the propriety of the trial court's decision to treble an exem-

plary damages award. In *POME*, we held that a plaintiff must meet a "heightened standard" when suing a defendant for the alleged "misuse or abuse of the administrative or judicial processes of government." *Id.* at 1368–69. Our holding was grounded in the First Amendment's guarantee of the right to petition the government for a redress of grievances and United States Supreme Court precedent recognizing that this right necessarily includes the right of access to the courts. *Id.*

¶ 2 Here, Bacheller sued General Steel, Discount Steel, and those companies' presidents for abuse of process, malicious prosecution, and civil conspiracy, based on their filing an arbitration complaint against him. The court of appeals held that the trial court did not abuse its discretion by refusing to include additional elements reflecting *POME*'s heightened standard in the jury instruction for Bacheller's malicious prosecution claims. The court of appeals also held that the trial court did not abuse its discretion by trebling an exemplary damages award against General Steel and Discount Steel.

¶ 3 We affirm the court of appeals. After reviewing *POME*, the federal case law on which that decision is based, and our precedent, we hold that *POME* does not apply where, as here, the underlying alleged petitioning activity was the filing of an arbitration complaint that led to a purely private dispute. Given our holding, the trial court did not err in by refusing to include the additional elements reflecting *POME*'s heightened standard in the jury instruction for Bacheller's malicious prosecution claims. We also hold that the trial court did not abuse its discretion by trebling the exemplary damages award against General Steel and Discount Steel. We remand to the court of appeals with directions to return the case to the trial court to enter final judgment consistent with this opinion.

## I. Facts and Procedural History

¶ 4 General Steel Corporation ("General Steel") and Discount Steel Buildings, LLC ("Discount Steel") are separate companies that market and sell pre-engineered steel buildings. Jeffrey Wayne Knight is the sole shareholder and president of General Steel, and Nathan Wright is the sole shareholder and president of Discount Steel.

¶ 5 Harold Bacheller worked as a salesman for General Steel during two separate periods between September 2002 and April 2005. Bacheller never worked for Discount Steel. Bacheller eventually quit General Steel and began working as a salesman for Universal Steel Buildings Corporation ("Universal Steel"), another company that sells pre-engineered steel buildings.

¶ 6 After Bacheller began working for Universal Steel, General Steel and Discount Steel filed an arbitration complaint against Bacheller and seven of his coworkers at Universal Steel pursuant to a binding arbitration clause in their employment contracts. Bacheller and his coworkers had all previously worked for either General Steel or Discount Steel. The complaint asserted claims against Bacheller for breach of contract, intentional interference with business relations, and civil conspiracy. The claims were based on the allegation that Bacheller had violated his employment contract with General Steel by misappropriating confidential information to benefit his new employer, Universal Steel.

¶ 7 Following a hearing, the arbitrator found in Bacheller's favor on all three claims asserted against him. Bacheller then sued General Steel, Discount Steel, Knight, and Wright ("Defendants"), asserting claims for abuse of process, malicious prosecution, and civil conspiracy, based on their filing of the arbitration complaint against him. Bacheller sought actual and exemplary damages against Defendants for all three claims. *See* § 13–21–102(1)(a), C.R.S. (2012) (permitting the jury to award reasonable exemplary damages in civil actions where the plaintiff's injury is attended by circumstances of "fraud, malice, or willful and wanton conduct").

¶ 8 At trial, following Bacheller's case-in-chief, Defendants moved for a directed verdict, arguing that they were entitled to judgment as a matter of law on Bacheller's abuse of process and malicious prosecution claims under *POME*'s heightened standard. In

*POME*, we recognized that the First Amendment, and specifically its guarantee of the right to petition the government for a redress of grievances, "necessarily includes the right of access to the courts." *POME*, 677 P.2d at 1365. To protect this right, we held that, when confronted with a motion to dismiss based on the First Amendment right to petition, a plaintiff bringing suit for "alleged misuse or abuse of the administrative or judicial processes of government" must meet a heightened standard showing that the defendant's petitioning activities (in *POME*, the filing of a lawsuit against a governmental entity) were not immunized from liability under the First Amendment. *Id.* at 1368–69. The trial court denied Defendants' motion.

¶ 9 After the close of evidence, and during the jury instruction conference, the parties disputed whether the jury instructions should include additional elements reflecting *POME*'s heightened standard for Bacheller's abuse of process, malicious prosecution, and civil conspiracy claims. Defendants argued that the jury instructions for all three claims should include the additional elements. The trial court initially stated that its "impression" was that "*POME* doesn't apply to this case at all because this is a purely private dispute," but it felt "compelled" to include additional elements reflecting *POME*'s heightened standard in the jury instruction

for Bacheller's abuse of process claims. (The trial court's decision to include additional elements reflecting *POME*'s heightened standard in the abuse of process jury instruction is not a subject of this appeal.) The court refused to include the additional elements for the malicious prosecution and civil conspiracy claims because it was unaware of any Colorado case applying *POME* to such claims. Thus, the jury instructions for Bacheller's malicious prosecution and civil conspiracy claims did not include any additional elements reflecting *POME*'s heightened standard.[1]

¶ 10 The jury returned a verdict in Bacheller's favor on his malicious prosecution claims against all Defendants, awarding both actual and exemplary damages. For Bacheller's malicious prosecution claims against the corporate defendants, the jury awarded Bacheller $15,000 in actual damages and $60,000 in exemplary damages against General Steel, and $5,000 in actual damages and $35,000 in exemplary damages against Discount Steel.[2] The jury returned a verdict in Bacheller's favor on his abuse of process claims against Discount Steel and Wright, again awarding both actual and exemplary damages. For Bacheller's abuse of process claim against Discount Steel, the jury awarded Bacheller $5,000 in actual damages and $25,000 in ex-

---

1. The issue whether jury instructions should contain additional elements reflecting *POME*'s heightened standard, as opposed to the trial court's deciding *POME* issues in a pretrial motion, was argued at trial but not appealed. *See POME*, 677 P.2d at 1368–69; *Krystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 870 (Colo. 2004) ("[S]ummary judgment is often the appropriate procedure for determining the merits of a First Amendment defense."). The issue is not before us, and we express no opinion about it. *See People v. Kruse*, 839 P.2d 1, 4 (Colo.1992) (stating that we need not consider issues that are not raised in a petition for certiorari).

We do note that this issue has created some confusion in the lower courts. Divisions of the court of appeals have interpreted *POME* as either changing the "elements" of an abuse of process claim, *see Henry v. Kemp*, 829 P.2d 505, 507 (Colo.App.1992), or adding a "fourth element" to an abuse of process claim, *see Lauren Corp. v. Century Geophysical Corp.*, 953 P.2d 200, 202 (Colo.App.1998). Relying in part on these cases, the Colorado pattern jury instructions and notes on use for abuse of process claims state that, when the First Amendment is raised as a defense,

the "plaintiff has the burden of proving an additional element," and the "[jury] instruction must be modified accordingly." CJI-Civ. 17:10 (2010). Recently, a division of the court of appeals held that "when an abuse of process claim is based on a sham litigation theory, the trial court, not the jury, must determine whether an abuse of process claim meets the 'heightened standard' stated in POME." *Health Grades, Inc. v. Boyer*, 2012 COA 196, ¶ 26, ―― P.3d ――, 2012 WL 5457419.

In deciding the issues for which we granted certiorari in the context in which this case has arisen, we do not purport to implicitly endorse the procedure that the trial court and the parties followed here. Instead, we leave this issue for another day when it is properly before us.

2. The jury also awarded Bacheller $10,000 in actual damages and $15,000 in exemplary damages against the president of General Steel, Knight, and $5,000 in actual damages and $15,000 in exemplary damages against the president of Discount Steel, Wright.

emplary damages.[3] The jury found in favor of General Steel and Knight on Bacheller's abuse of process claims and in favor of all Defendants on Bacheller's civil conspiracy claims.

¶ 11 Defendants objected to the jury's damages award, arguing that the jury was prohibited from awarding exemplary damages in excess of actual damages. *See* § 13–21–102(1)(a) ("The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."). In accordance with the exemplary damages statute, the trial court reduced the jury's award of exemplary damages to correspond to the jury's award of actual damages for all claims in which the jury found in Bacheller's favor, and then it entered judgment against Defendants.

¶ 12 Later, Bacheller filed a motion to amend the judgment and to increase the exemplary damages award under section 13–21–102(3), which provides that a court may increase an award of exemplary damages up to three times the amount of actual damages awarded if it is shown that the "defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff."

¶ 13 The trial court concluded that the actions of the corporate defendants during the pendency of the case constituted a pattern of attempts to delay, to harass, and to intimidate Bacheller and that their actions were motivated by a business dispute with Universal Steel, of which Bacheller "was simply caught in the middle." In coming to this conclusion, the court focused on three categories of conduct. First, the court found that Defendants made multiple requests before trial that Bacheller submit to an independent medical examination with the "only purpose" to "harass, intimidate, and aggravate" him. Second, the court found that Defendants used Bacheller "as a pawn in an ongoing business dispute" with Universal Steel and attempted to use the trial court and discov-

ery mechanisms "to gain confidential information from [Universal Steel]." The court noted that Knight had testified at trial that he "had overwhelming evidence that Mr. Bacheller had joined an illegal organization that was stealing from my company" and further found that Defendants' attempts to gain this confidential information were part of a continuing "vendetta" against Universal Steel. Third, the court found that Defendants concealed their intent from the trial court to petition this court under C.A.R. 21 solely "for the purpose of delay, which would further prolong and aggravate [Bacheller's] damages." In sum, the court found that "Defendants acted in a willful and wanton manner which further aggravated [Bacheller's] damages, and Defendants knew or reasonably should have known that such actions would produce such aggravation." The court further found that the behavior was "extraordinary and abusive."

¶ 14 Pursuant to its findings of fact, the court then trebled the exemplary damages award against the corporate defendants under section 13–21–102(3), increasing it from $15,000 to $45,000 for Bacheller's malicious prosecution claim against General Steel; $5,000 to $15,000 for Bacheller's malicious prosecution claim against Discount Steel; and $5,000 to $15,000 for Bacheller's abuse of process claim against Discount Steel. In contrast to the corporate defendants, the court denied Bacheller's request to treble the exemplary damages award against the individual defendants Knight and Wright.

¶ 15 Both sides appealed. As pertinent here, Defendants contended that the trial court erred by denying their request to include the additional elements reflecting *POME*'s heightened standard in the malicious prosecution jury instruction, and that the trial court abused its discretion by trebling the exemplary damages award against the corporate defendants. The court of appeals held that the trial court did not abuse its discretion by refusing to include additional elements reflecting *POME*'s heightened standard in the malicious prosecution jury

---

**3.** The jury also awarded Bacheller $5,000 in actual damages and $25,000 in exemplary damages

against Wright.

instruction because the court instructed the jury in accordance with Colorado's pattern instructions, and because no Colorado appellate court has held that *POME* applies to malicious prosecution claims. The court of appeals also held that the trial court did not abuse its discretion by trebling the exemplary damages award against the corporate defendants. The court of appeals found that the record supported the trial court's order trebling exemplary damages on the sole basis of Defendants' "repeated requests for an [independent medical examination]" and their multiple attempts to discover Universal Steel's "sales leads data." Because "[t]hese two grounds provided a sufficient basis for the court's discretionary decision to treble the exemplary damages [award]," the court of appeals held that the trial court did not abuse its discretion.

¶ 16 Defendants petitioned this court for review, and we granted certiorari.[4] Following our grant of certiorari, we requested supplemental briefing on an additional issue: whether Defendants' "actions at issue in this case fall within the category of activities to which the heightened standards of [*POME*] apply[ ]."

## II. Analysis

¶ 17 First, we address whether *POME* is applicable here. Second, we consider whether the trial court abused its discretion by trebling the exemplary damages award against General Steel and Discount Steel.

### *POME*

¶ 18 The First Amendment to the United States Constitution guarantees "the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I. Although the right to petition encompasses activities of a traditional political nature, "its sweep is much broader and includes other forms of activity as well." *POME*, 677 P.2d at 1365. For instance, because the right to petition extends to all departments of the government, including the courts, "[t]he right of access to the courts is indeed but one aspect of the right of petition." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *POME*, 677 P.2d at 1365 ("[T]he right to petition the government for redress of grievances necessarily includes the right of access to the courts."). Therefore, because "[a]ccess to the courts is often the only method by which a person or a group of citizens may seek vindication of federal and state rights and ensure accountability in the affairs of government," the right to petition has been applied to "immunize various forms of administrative and judicial petitioning activity from legal liability in subsequent litigation." *POME*, 677 P.2d at 1365.

¶ 19 In *POME*, Gayno, Inc. and Lockport Corporation ("collectively Gayno") filed an application with Jefferson County seeking to rezone 507 acres of farm land to allow for residential and commercial development. *Id.* at 1362–63. The Jefferson County Board of County Commissioners approved Gayno's application. *Id.* at 1363. Later, under C.R.C.P. 106, Protect Our Mountain Environment, Inc. ("environmental group") sought district court review of the Board's decision, alleging that the Board had exceeded its jurisdiction and abused its discretion by ap-

---

4. We granted certiorari to review the following issues:

   1. Whether the court of appeals erred in failing to apply the heightened standards required by this Court's seminal decision in [*POME*] to Respondent's malicious prosecution claim where such claim was entirely predicated upon Petitioners' petitioning activities.
   2. Whether the court of appeals erred by improperly and narrowly applying *POME* to Petitioners' prior litigation by limiting the defense to only the prior litigation as to Respondent and not the entire litigation and excluding the evidence relating to the other arbitration respondents.
   3. Whether the court of appeals erred by failing to apply issue preclusion based on the arbitrator's decisions as to whether the prior litigation as a whole, and the narrower litigation as to Respondent alone, was devoid of factual or legal support.
   4. Whether the court of appeals erred in failing to find that the trial court abused its discretion in trebling exemplary damages based upon action taken by counsel in the litigation itself.

proving Gayno's zoning application.[5] *Id.* The district court ruled against the environmental group, and the court of appeals affirmed the district court's judgment in an unpublished opinion. *Id.* at 1364.

¶ 20 Gayno then sued the environmental group and its legal counsel in district court, alleging that the environmental group had abused the legal process by bringing the C.R.C.P. 106 action and asserting claims it knew were without legal justification. *Id.* In response, the environmental group filed a motion to dismiss Gayno's complaint on the ground that the environmental group's C.R.C.P. 106 action was a lawful exercise of its First Amendment right to petition the government for a redress of grievances. *Id.* The court concluded that the environmental group's C.R.C.P. 106 action was a "sham" not entitled to First Amendment protection and denied the motion. *Id.* The environmental group then sought relief from this court under C.A.R. 21. *Id.*

¶ 21 To resolve *POME*, we turned to United States Supreme Court precedent construing the right to petition and specifically the *Noerr–Pennington* doctrine, which arose in the antitrust context and reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment right to petition. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *see also Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 929 (9th Cir.2006).

¶ 22 In *Noerr,* trucking companies brought suit against railroad companies, alleging that the railroad companies had violated the Sherman Act by conducting a negative publicity campaign designed to influence legislation regulating the trucking industry. *Id.* at 129, 81 S.Ct. 523. The Supreme Court concluded that the Sherman Act could not be construed to bar the railroad companies' conduct because a construction of the Sherman Act "that would disqualify people from taking a public position on matters in which they are

financially interested" would "deprive the people of their right to petition" the government, "at least insofar as the railroads' campaign was directed toward obtaining governmental action." *Id.* at 139–40, 81 S.Ct. 523.

¶ 23 In *Pennington,* the Supreme Court applied *Noerr* to immunize from Sherman Act liability lobbying activities directed toward executive branch officials because "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose." *Pennington,* 381 U.S. at 670, 85 S.Ct. 1585. Later, in *California Motor Transport Co.,* the Supreme Court, drawing on the *Noerr–Pennington* doctrine, recognized that "the right to petition extends to all departments of the Government" and that "[t]he right of access to the courts is ... but one aspect of the right of petition." *California Motor Transport Co.,* 404 U.S. at 510, 92 S.Ct. 609; *POME,* 677 P.2d at 1365.

¶ 24 Drawing on this line of cases, we stated in *POME* that "[a]ccess to the courts is often the only method by which a person or group of citizens may seek vindication of federal and state rights and ensure accountability in the affairs of government." *POME,* 677 P.2d at 1365. Therefore, we recognized that the "First Amendment right to petition [the government] has been applied to immunize various forms of administrative and judicial petitioning activity from legal liability in subsequent litigation." *Id.*

¶ 25 However, we also recognized that the right to petition the government is not without limits. *Id.* at 1366. In *Noerr,* the Supreme Court stated that Sherman Act liability could still attach to petitioning activity that, while "ostensibly directed toward influencing governmental action," in actuality constituted a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. 523. Based on this "sham exception," the Supreme Court has held that baseless litigation is not immunized by the First Amendment right to petition. *See Bill*

---

**5.** C.R.C.P. 106(a)(4) allows a party to seek relief in district court when an inferior tribunal ex-

ceeds its jurisdiction or abuses its discretion.

*Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("Just as false statements are not immunized by the First Amendment right to freedom of speech ... baseless litigation is not immunized by the First Amendment right to petition." (internal citations omitted)).

¶ 26 In *POME*, we adopted the Supreme Court's "sham exception" and held that a plaintiff who sues another for prior petitioning activity must make a "showing that the petitioning activity had lost its constitutionally privileged status by reason of its use primarily for some improper collateral purpose." *POME*, 677 P.2d at 1367. Hence, a plaintiff who sues another for the "alleged misuse or abuse of the administrative or judicial processes of government" must meet a "heightened standard" sufficient to show that the defendant's petitioning activities were not immunized from liability under the First Amendment. *Id.* at 1369. Specifically, a plaintiff must show that (1) the defendant's administrative or judicial claims were devoid of reasonable factual support or lacked any cognizable basis in law; (2) the primary purpose of the defendant's petitioning activity was to harass the plaintiff or to effectuate some other improper objective; and (3) the defendant's petitioning activity had the capacity to affect adversely a legal interest of the plaintiff. *Id.*

¶ 27 Our most recent case discussing *POME* is *In re Foster*, 253 P.3d 1244 (Colo. 2011). In *Foster*, an attorney appealed an order of the Presiding Disciplinary Judge ("PDJ") and disciplinary hearing board ("Board") sanctioning him for engaging in a protracted litigation "campaign" against his now ex-wife, in which he appeared pro se. *Id.* at 1247. The Office of Attorney Regulation Counsel ("OARC") investigated the attorney and ultimately filed charges against him for violating the Colorado Rules of Professional Conduct. *Id.*

¶ 28 At the disciplinary proceeding, the attorney filed a motion for summary judgment, alleging that his litigation against his ex-wife was protected by the First Amendment right to petition and that the OARC bore the burden of showing that his litigation was not constitutionally protected under *POME*. *Id.* The Board rejected the attorney's argument and held that his "freedom of speech and access to the courts ... do not immunize him from the application of the Colorado Rules of Professional Conduct." *Id.* at 1250. The Board suspended the attorney from the practice of law and ordered him to pay the costs of the disciplinary proceedings. *Id.* He then appealed to this court. *Id.*

¶ 29 To resolve *Foster*, we stated that we were deciding the applicability of *POME* within "the context of attorney discipline for pro se litigation conduct." *Id.* at 1251. After considering the state's interest in regulating representative conduct by attorneys, the state's interest in regulating pro se attorney litigation conduct, and *POME*, we concluded that "the First Amendment and due process concerns underlying *POME* are equally applicable in the context of pro se attorney discipline as they are in a civil case." *Id.* at 1252–54. Hence, we adopted a rule that *POME* applies in the attorney discipline context, but we also noted that the *POME* framework need not be applied in precisely the same manner as in the civil litigation context. *Id.* at 1254–55.

¶ 30 In both *POME* and *Foster*, we did not specifically address what type of activity constitutes "petitioning the government" such that the activity is entitled to protection under the First Amendment right to petition in the first instance, and neither case purports to resolve that issue. *See* Matthew Spohn, *Combating Bad–Faith Litigation Tactics with Claims for Abuse of Process*, 38 Colo. Law. 31, 35 (Dec. 2009) ("The only uncertainty is whether *POME* is limited to cases where the challenged lawsuit relates to public matters rather than a purely private dispute; though some courts have acknowledged scholarship arguing this limitation, no court has squarely addressed it.").

¶ 31 We address two contentions regarding *POME*'s applicability to this case. First, Defendants contend that, under *POME* and the federal case law that forms the basis of that decision, their filing of an arbitration complaint against Bacheller constitutes "petitioning the government" such that their al-

leged petitioning activity "merit[s] *POME* First Amendment protection." Second, we address whether *Foster* requires us to apply *POME* where the underlying alleged petitioning activity involves a purely private dispute.

¶ 32 We hold that, consistent with the *Noerr–Pennington* doctrine on which it is based, *POME*'s heightened standard does not apply where, as here, the underlying alleged petitioning activity was the filing of an arbitration complaint that led to a purely private dispute. *Foster* does not compel a contrary conclusion.

¶ 33 In *Noerr*, as noted, the petitioning activity at issue was a publicity campaign "directed toward obtaining governmental action." *Noerr*, 365 U.S. at 139, 81 S.Ct. 523. That is, the petitioning activity constituted "an attempt to persuade the legislature or executive to take particular action with respect to a law." *Id.* at 136, 81 S.Ct. 523. Similarly, in *Pennington*, the Supreme Court applied *Noerr* to lobbying efforts directed toward executive branch officials. *Pennington*, 381 U.S. at 670, 85 S.Ct. 1585. In both *Noerr* and *Pennington*, the petitioning activities were lobbying efforts meant to influence government officials to change the law. In *California Motor Transport, Inc.*, the Supreme Court recognized that the First Amendment right to petition includes the right of access to the courts and that "it would be destructive of [the] rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business

and economic interests vis-à-vis their competitors." *Id.* at 510–11, 92 S.Ct. 609.

¶ 34 Here, Defendants initiated a private arbitration action pursuant to a binding arbitration clause in an employment contract. *See Lane v. Urgitus*, 145 P.3d 672, 679 (Colo. 2006) ("Under Colorado's arbitration act, a valid, enforceable arbitration provision divests trial courts of jurisdiction over all questions that are to be submitted to arbitration, pending the conclusion of arbitration."). As such, they did not petition any branch of government for a redress of grievances. They did not bring suit against a governmental entity in an effort to overturn an administrative decision, as in *POME*; they did not "attempt to persuade the legislature ... to take particular action with respect to a law," as in *Noerr*; they did not lobby executive branch officials, as in *Pennington*; and, even assuming that the right to petition is implicated whenever a party exercises his or her right of access to the courts,[6] they did not "use the channels and procedures of ... [the] courts to advocate their causes and points of view," as in *California Motor Transport Co.* Moreover, Defendants' arbitration action was not instituted in an attempt to vindicate the rights of the public, as in, for example, the civil rights context, such that the petitioning activity could be considered a form of political expression. *Cf. NAACP v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government.... It is thus a form of political expression.").[7] Thus, Defendants'

---

6. *But see Anchorage Joint Venture v. Anchorage Condo. Ass'n*, 670 P.2d 1249, 1250–51 (Colo.App. 1983) ("The right of access to the courts *seeking redress from actions of a governmental entity* is one aspect of the right to petition guaranteed by the First Amendment." (citing *California Motor Trans. Co.*) (emphasis added)); Timothy P. Getzoff, Comment, *Dazed and Confused in Colorado: The Relationship Among Malicious Prosecution, Abuse of Process, and the Noerr–Pennington Doctrine*, 67 U. Colo. L.Rev. 675, 688 (1996) ("[T]he scope of 'petitioning the government' has been held to include 'the right of access to the courts.' In the broadest sense, this could cover all litigation, concerning both public and private dis-

putes. However, this broad reading is unwarranted....").

7. We do not mean to suggest that Defendants' initiating an arbitration action, rather than filing a lawsuit in court, is in itself totally dispositive of the *POME* question. *See Judd Constr. Co. v. Evans Joint Venture*, 642 P.2d 922, 924 (Colo. 1982) (encouraging the use of arbitration as an "efficient, convenient alternative to litigation"). Rather, we also find persuasive the fact that the arbitration action here was a purely private dispute brought pursuant to a binding arbitration clause in an employment contract between private parties. We are not here faced with an

alleged petitioning activity does not merit protection under the First Amendment right to petition and *POME*.

¶ 35 *Foster* does not compel a contrary conclusion. In deciding that *POME* should be applied in attorney discipline cases where an attorney has been charged with abusive pro se litigation conduct, we did not necessarily extend *POME* to situations where the underlying petitioning activity constituted a purely private dispute. Rather, we addressed the specific issue of whether *POME* applies in the attorney discipline context as it does in the civil litigation context. *In re Foster*, 253 P.3d at 1251. We held that it does. *Id.* at 1254 ("[T]he First Amendment and due process concerns underlying *POME* are equally applicable in the context of pro se attorney discipline as they are in a civil case."). We were not asked to address what type of activity constitutes "petitioning the government" in *Foster*, and we did not purport to resolve that issue in that case. Hence, *Foster* does not require us to apply *POME* here.

¶ 36 Given our analysis of *POME* and our holding concerning the scope of alleged petitioning activity it protects, the trial court did not err in denying Defendants' request to include the additional elements reflecting *POME*'s heightened standard in the jury instruction for Bacheller's malicious prosecution claims.

¶ 37 The second issue for which we granted certiorari concerns whether the court of appeals erred by improperly applying *POME*. The third issue for which we granted certiorari concerns whether the court of appeals erred by failing to apply issue preclusion. Specifically, Defendants contend that the arbitrator's finding that the arbitration action was not frivolous and groundless in the attorney fee context precludes Bacheller from establishing *POME*'s first prong, namely, that Defendants' arbitration complaint was devoid of reasonable factual support or lacked any cognizable basis in law. Both issues are necessarily dependent on a conclu-

sion that *POME* is applicable here. Because it is not, we do not address the second and third issues for which we granted certiorari or the parties' arguments about them.

### Trebled Exemplary Damages

¶ 38 Defendants next contend that the trial court erred by trebling the exemplary damages award against the corporate defendants, General Steel and Discount Steel. Because the record supports the trial court's finding that the corporate defendants acted willfully and wantonly during the pendency of the case that further aggravated Bacheller's damages, we hold that the trial court did not abuse its discretion by trebling the exemplary damages award.

¶ 39 Defendants contend in reply that a de novo standard of review applies to the trial court's order trebling the exemplary damages award. They rely on *Qwest Services Corp. v. Blood*, 252 P.3d 1071 (Colo.2011), in which we conducted a de novo review to determine whether the evidence was sufficient to justify the jury's verdict awarding exemplary damages, and whether the exemplary damages award was "excessive and disproportionate" in violation of the Due Process Clause. *Id.* at 1092, 1094.

¶ 40 Here, in contrast to *Blood*, Defendants, in their petition for certiorari and briefs on appeal, challenge the trial court's order trebling the exemplary damages award under section 13–21–102(3). They do not challenge the sufficiency of the evidence supporting the jury's verdict returning exemplary damages or the constitutionality of the jury's award. In other words, Defendants do not argue that the jury should not have considered Bacheller's claims for exemplary damages in the first instance. Nor do Defendants argue that the exemplary damages award was excessive and disproportionate and thus unconstitutional. As such, the *Blood* standard and de novo review do not apply to a trial court's decision to treble damages after the jury returns a verdict entitling a party to exemplary damages.

---

arguably different situation in which the arbitration was somehow required by law (although we are unaware of any mandatory arbitration statutes in Colorado), or where a governmental enti-

ty is a party to the arbitration, such that filing the arbitration could be considered "petitioning the government" under the First Amendment and *POME*.

¶ 41 Rather, to review the trial court's order trebling exemplary damages under section 13–21–102(3), an abuse of discretion standard is appropriate. *See Harvey v. Farmers Ins. Exch.*, 983 P.2d 34, 40 (Colo. App.1998) (stating that a trial court's decision to treble exemplary damages is "entrusted to its sound discretion" because section 13–21–102(3) contains permissive, rather than mandatory, language); *Martin v. Union Pac. R.R. Co.*, 186 P.3d 61, 71–72 (Colo.App.2007) (applying abuse-of-discretion standard to a trial court's order trebling exemplary damages), *rev'd on other grounds,* 209 P.3d 185 (Colo.2009).

¶ 42 Under this standard, we reverse a trial court only if its decision was "manifestly arbitrary, unreasonable, or unfair." *Streu v. City of Colorado Springs*, 239 P.3d 1264, 1268 (Colo.2010) (quoting *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993)). "It is not necessary that we agree with the trial court's decision." *Id.* (*citing In re Bueno*, 248 B.R. 581, 582–83 (D.Colo.2000) (explaining that under an abuse-of-discretion standard the trial court's reason "need not be one that is agreeable to the reviewing court")). The trial court's determination simply must not "exceed[ ] the bounds of the rationally available choices." *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir.2008).

¶ 43 A trial court "may" increase an exemplary damages award up to three times the amount of actual damages if it is shown that the "defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation." § 13–21–102(3)(b).

¶ 44 Here, the trial court found that "Defendants acted in a willful and wanton manner which further aggravated [Bacheller's] damages, and Defendants knew or reasonably should have known that such actions would produce such aggravation." In support of this conclusion, the court made detailed findings of fact regarding three discrete categories of litigation conduct perpetrated by Defendants. First, the court found that Defendants made multiple requests that Bacheller submit to an independent medical examination with the only purpose to "harass, intimidate, and aggravate" him. The court further found that these requests had been filed by Defendants' "in house counsel" and were "clearly wanton and willful," as that phrase is defined in the statute. Second, the court found that Defendants used Bacheller "as a pawn in an ongoing business dispute" with Universal and "attempt[ed] to use the Court to gain confidential information" from Universal Steel as part of Defendants' continuing "vendetta" against it. In support of this finding, the court noted that Knight, in his trial testimony, stated that he "had overwhelming evidence that Mr. Bacheller had joined an illegal organization that was stealing from my company." Third, the court found that Defendants had concealed their intent to file an original proceeding under C.A.R. 21 with this court, with the only purpose to "further prolong and aggravate [Bacheller's] damages." The court noted that it had previously denied Defendants' motion for summary judgment two months before they filed an original proceeding "on that very issue" and that Defendants could have filed an original proceeding in a "more timely fashion," rather than wait until two weeks before trial was set to begin. In sum, the found that Defendants' behavior was "extraordinary and abusive" and constituted a pattern of attempts to delay, intimidate, and harass Bacheller.

¶ 45 The record supports the trial court's findings. First, the record shows that Defendants made multiple requests that Bacheller submit to an independent medical examination on the ground that he had put his mental condition in controversy by virtue of his asserting general damages for pain and suffering in his complaint. Specifically, Defendants' in-house counsel sent Bacheller a letter stating that he had placed his physical and mental condition in controversy and requested an independent medical examination on that point. Bacheller responded by letter, clarifying that he had not placed his physical or mental condition in controversy by assert-

ing general damages for "pain and suffering, fear, anxiety, humiliation, embarrassment, indignity, and mental anguish." Nevertheless, Defendants endorsed an expert witness to testify at trial on this point. Bacheller was then forced to file a motion in limine objecting to Defendants' endorsement of the expert witness, arguing that Bacheller's general allegations of mental suffering and emotional distress had not placed his physical or mental condition in controversy under C.R.C.P. 35(a). *See Tyler v. Dist. Court*, 193 Colo. 31, 34, 561 P.2d 1260, 1262–63 (1977); *Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166, 176 (Colo. App.1995), *rev'd in part on other grounds*, 940 P.2d 371 (Colo.1997); *see also Hoffman v. Brookfield Rep., Inc.*, 87 P.3d 858, 863 (Colo.2004). Tellingly, in response to Bacheller's motion in limine, Defendants withdrew their endorsement of the expert witness two weeks before trial.

¶ 46 Second, there is evidence in the record that Defendants made multiple attempts to use the trial court and discovery mechanisms to gain confidential information from Universal Steel, all of which were unsuccessful, and that these attempts were motivated by an ongoing business dispute between Defendants and Universal Steel. The record shows that Defendants sent Universal Steel a subpoena duces tecum requesting that it produce, among other things, specific customer information and "sales leads." Universal Steel filed a motion to quash the subpoena on grounds that it was unreasonable and oppressive because Defendants had requested "hundreds of customer files and thousands of sales leads." Universal Steel also noted that Defendants had already requested the same information in two separate subpoenas during the underlying arbitration action, both of which were unsuccessful.[8] The trial court granted Universal Steel's motion to quash.

Defendants then filed a motion to compel discovery against Bacheller, seeking the same information. The trial court denied Defendants' motion to compel, stating, as pertinent here, that the information requested "was not reasonably calculated to lead to the discovery of relevant or admissible evidence," that the motion concerned confidential information of Universal Steel, and that the information "has been requested previously multiple times in multiple jurisdictions."[9]

¶ 47 Third, there is evidence in the record supporting the trial court's finding that Defendants petitioned this court under C.A.R. 21 "for the purpose of delay." The record shows that, two weeks before trial was set to begin, Defendants filed an original proceeding with this court, in which they sought to raise an issue that had been rejected by the trial court two months before. Defendants did not inform the trial court of their intent to file this original proceeding, despite having attended a pretrial status conference five days before filing.

¶ 48 Hence, given that the record supports the trial court's findings, and being mindful that our review is limited to determining whether the trial court's decision fell within a range of rationally available choices, we hold that the trial court did not abuse its discretion by trebling the exemplary damages award against the corporate defendants under section 13–21–102(3).[10] *See Harvey*, 983 P.2d at 40 (acknowledging that the trial court is in a better position than an appellate court to evaluate the conduct of a defendant).

## III. Conclusion

¶ 49 For the reasons discussed above, we hold that the trial court not did err in denying Defendants' request to include the addi-

---

8. We do not mean to suggest that we may consider Defendants' actions in cases other than this one. *See* § 13–21–102(3)(b) (requiring that it be shown that the defendant acted in a willful and wanton manner "during the pendency of the action").

9. Defendants argue that, because Bacheller did not seek sanctions for their alleged discovery abuses, the trial court erred in finding that their conduct was "willful and wanton" under the exemplary damages statute. The exemplary

damages statute contains no requirement that a party must first seek sanctions under C.R.C.P. 37 or C.R.C.P. 11 before filing a motion to treble an exemplary damages award.

10. We note that the trial court's order trebling the exemplary damages award against General Steel and Discount Steel resulted in an award that was still less than that which the jury initially awarded.

tional elements reflecting *POME*'s heightened standard in the jury instruction for Bacheller's malicious prosecution claims, and we hold that the trial court did not abuse its discretion by trebling the exemplary damages award against the corporate defendants, General Steel and Discount Steel. The judgment of the court of appeals is affirmed.

Justice EID concurs in part and dissents in part.

JUSTICE EID, concurring in part and dissenting in part.

¶ 50 The majority affirms the district court's trebling of punitive damages on the ground that there is evidence in the record to support the court's conclusion that the corporate defendants engaged in certain conduct during the pendency of the case. Maj. op. at ¶ ¶ 44–48. But under the straightforward language of the statute, trebling is only appropriate "if it is shown" that the defendant's conduct "further aggravated the damages of the plaintiff." § 13–21–102(3)(b), C.R.S. (2012). In other words, it is not enough for the conduct simply to have occurred, as the majority suggests, "it must be shown" that the conduct actually aggravated the plaintiff's damages. Because this "showing" has not been made in this case, the district court's trebling determination must be reversed on this ground alone.

¶ 51 Moreover, the conduct that formed the basis for the district court's trebling decision—namely, discovery requests and the filing of a Rule 21 petition with this court—does not meet the statutory requirement of "willful and wanton," defined as conduct that "the actor must have realized [was] dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others." § 13–21–102(1)(b), C.R.S. (2012). In my view, the conduct that occurred in this case is of the sort that, if found to be frivolous or abusive, would warrant an award of attorneys' fees, not the trebling of a punitive damage award. For these reasons, although I join the majority's decision with regard to the scope of *POME*, I respectfully dissent from its decision to affirm the trebling of punitive damages.

¶ 52 The district court based its trebling determination on the fact that the corporate defendants (1) failed to inform the district court that a Rule 21 petition had been filed, (2) sought to discover confidential information from a third-party competitor, and (3) made requests for plaintiff to submit to an independent medical examination. Maj. op. at ¶ ¶ 44–47. The majority finds that there is evidence in the record to support the district court's determination that the corporate defendants engaged in this conduct. *Id.* But it is not enough for a defendant to have engaged in particular conduct; on the contrary, such conduct can serve as the basis for a trebling decision only if "it is shown" that the conduct "further aggravated the damages of the plaintiff." § 13–21–102(3)(b).[1] The fundamental flaw in the majority's opinion is its failure to consider whether the conduct "was shown" to have aggravated plaintiff's damages. If it were to make such an inquiry, it would find that no showing was made in this case.

¶ 53 Here, the district court looked not to the damages caused by the conduct, but instead to the "purpose" of the conduct. For example, with regard to the filing of the Rule 21 petition, the district court concluded "[t]he only reason the Court can conceive that [the corporate] Defendants did not raise this issue [of the filing of the Rule 21] would be for *the purpose of delay,* which would further prolong and aggravate Plaintiff's damages." (Emphasis added). The majority similarly focuses on the "purpose" of the conduct. Maj. op. at ¶ 47. But the fact is that the Rule 21 petition was denied, and thus its filing did not in fact cause delay, nor aggravate plaintiff's damages. Similarly, the district court found that "*[t]he only purpose* of requesting [a medical examination] would be

---

1. Section 13–21–102(3) states, in relevant part, that

    the court may increase any award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if it is shown that: ... (b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

to harass, intimidate, and aggravate the Plaintiff." (Emphasis added). The majority echoes the district court's "purpose" finding. *Id.* at ¶ 44. But again, the question is not whether the conduct had a particular purpose, but rather whether it had a particular result—that is, whether it aggravated the plaintiffs damages. Finally, the district court found that the corporate defendants sought confidential information from the plaintiff's new employer, a non-party competitor. According to the district court, the purpose of the conduct was to pursue a "vendetta" against the non-party, a charge the majority repeats. *Id.* But here the lack of a finding of aggravation of plaintiff's damages is even more evident, as the conduct, according to the district court's finding, was not even directed at the plaintiff.[2]

¶ 54 Nor can such aggravation of plaintiff's damages simply be assumed from the "purpose" of the conduct. As the statutory language makes clear, such aggravation of damages must be "shown." The district court's conclusory statement at the end of its order—suggesting that the corporate defendants' conduct "further aggravated Plaintiff's damages"—is thus insufficient. Significantly, the majority does not attempt to bolster the district court's conclusory statement; it merely repeats it. *Id.* In the end, no matter how many times the majority points to the fact that the district court made findings related to the conduct's occurrence, *see, e.g., id.* (noting that the district court "made detailed findings of fact regarding three discrete categories of litigation conduct perpetrated by [the corporate] Defendants"); *id.* at ¶ 45 ("The record supports the trial court's findings."); *id.* at ¶ 48 (noting that it would find no abuse of discretion "given that the record supports the trial court's findings"),

those findings are beside the point if they fail to "show[ ]" that the defendant's conduct "further aggravated the damages of the plaintiff." Because there has been no such showing in this case, the district court's trebling order must be reversed on this ground alone.

¶ 55 Moreover, in my view, the above-described conduct does not meet the definition of "willful and wanton conduct" that can serve as an appropriate basis for trebling. Section 13–21–102(1)(b) defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Here, it is hard to see how the corporate defendants could have "realized" that their conduct—namely, the filing of discovery requests and a Rule 21 petition—would qualify as conduct that was "dangerous, done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others."

¶ 56 For example, the majority points out that the corporate defendants, due to the plaintiff's assertion of "general damages for pain and suffering in his complaint," requested that he undergo an independent medical examination and also endorsed an expert witness on the issue. Maj. op. at ¶ 45. The plaintiff was then "forced" to file a motion in limine objecting to the witness and pointing out that a general assertion of pain and suffering damages does not place a person's physical or mental condition at issue. *Id.* The majority does not, however, point out that the plaintiff's complaint made a claim for "physical" injuries relating to pain and suf-

2. Section 13–21–102(3)(a) allows trebling of punitive damages "if it is shown that ... [t]he defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff *or another person or persons*, during the pendency of the case." (Emphasis added). The district court did not suggest, however, that it was relying on (3)(a), instead of (3)(b), with regard to the non-party discovery. But even if it were relying on this section, the district court did not make any determination that the defendant repeated "the

behavior" or "action" that was "the subject of the claim against the defendant." The U.S. Supreme Court has held that using conduct directed at third parties as the basis of a punitive damages determination raises constitutional concerns, *Philip Morris USA v. Williams*, 549 U.S. 346, 353, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007); *see also Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1083 (Colo.2011), which we should seek to avoid in interpreting a statute, *Catholic Health Initiatives Colo. v. City of Pueblo Dep't of Fin.*, 207 P.3d 812, 822 (Colo.2009).

fering[3]—a claim that would fall outside of the case law governing general allegations of pain and suffering. *Id.* (citing cases). In his motion in limine, plaintiff clarified that he was not seeking damages for physical injuries, and hence the medical examination and expert testimony on the topic were not warranted. As the majority points out, the corporate defendants then withdrew their expert witness. *Id.* Interpreted at its very worst, the conduct in question might merit the sanction of attorneys' fees for the filing of a frivolous motion. *See* § 13–17–102(4), C.R.S. (2012) (permitting the award of attorneys' fees for discovery abuses). But there was no such request from the plaintiff at the time, nor a suggestion by the court. *Id.* (permitting sanctions upon the court's own initiative).

¶ 57 Similarly, when the corporate defendants sought discovery from their non-party competitor, that non-party filed a motion to quash the subpoena, which the district court granted. Again, there are numerous sanctions available for improper subpoenas, including the award of attorneys' fees. *See, e.g., id.; In re Marriage of Wiggins,* 2012 CO 44, ¶ 33, 279 P.3d 1, 10 (remanding the case for determination of whether an award of attorneys' fees or other sanction was appropriate for a subpoena that violated C.R.C.P. 45). But again, as with the request for a medical examination, no such request was made by the non-party, nor suggested by the court.

¶ 58 Finally, and most obviously, the filing of an original proceeding with this court cannot be deemed "willful and wanton" because it is plainly permitted by our rules. *See* C.A.R. 21. The district court, as the majority points out, suggested that the corporate defendants "concealed their intent" to file the original proceeding and failed to file in a "timely fashion." Maj. op. at ¶ 44. But while it is good practice for a party to inform the court and other parties of its intention to file a Rule 21 petition, there is no requirement in the rule or elsewhere that it do so. In addition, there is no time limit for filing a Rule 21 with this court, although lack of timeliness may be a ground for denying the petition. *See In re A.H.,* 216 P.3d 581, 585 (Colo.2009). Even the court of appeals recognized that this conduct, standing alone, could not support a trebling of punitive damages. *See Bacheller v. General Steel,* No. 09CA1383, slip op. at 19–20, 2010 WL 1611081 (Colo.App. Apr. 22, 2010) (not selected for official publication).

¶ 59 This is not to condone the conduct at issue in this case. Nor is it to say that litigation conduct can never serve as a basis for trebling. *See, e.g., Tait v. Hartford Underwriters Ins. Co.,* 49 P.3d 337 (Colo.2001) (finding treble damages appropriate when an insurance company committed repeated discovery violations, attempted several times to remove the case to federal court in order to circumvent an expedited trial date for an eighty-year-old man who died shortly after trial, and delegated to counsel many ongoing obligations to insured). Rather, it is to say that here the conduct does not constitute "willful and wanton conduct" as defined by statute, and thus cannot serve as the basis for trebling punitive damages. There is no requirement, as the majority notes, that a party must seek sanctions before filing a motion for trebling of punitive damages. Maj. op. at ¶ 46 n. 9. However, our case law has repeatedly recognized the concept of proportionality in sanctions, *see, e.g., Pinkstaff v. Black & Decker (U.S.) Inc.,* 211 P.3d 698, 702 (Colo.2009) (recognizing the concept of proportionality in trial sanctions); *Trattler v. Citron,* 182 P.3d 674, 682 (Colo.2008) (same), and it is difficult to see how litigation conduct that does not draw a motion for sanctions could serve as the basis for trebling punitive damages. *Cf. Netquote, Inc. v. Byrd,* No. 07–CV–00630, 2009 WL 902437, at *16 (D.Colo.2009) (refusing to award punitive damages under section 13–21–102(b) when the defendant "never violated a court order, was never sanctioned for its litigation behavior, and ... conduct at trial was quite professional").

¶ 60 The majority does not attempt to parse the statute in this way, and instead adopts an extremely deferential standard of

---

**3.** Plaintiff's complaint alleged "losses or injuries for *physical and mental pain and suffering*" and "losses or injuries for *physical pain and suffering.*" (Emphasis added).

review that apparently is to be applied generally to the district court's decision to order treble punitive damages. According to the majority, a decision to treble punitive damages should be affirmed as long as the court did not abuse its discretion, which it defines as not irrational. Maj. op. at ¶ 48. But in my view, we must apply a de novo standard in this case, given that the district court made two legal errors—first, by trebling damages without determining, as required by the statute, that the plaintiff's damages were actually aggravated by the defendant's conduct; and second, by using trial conduct that did not rise to the level of willful and wanton conduct as the basis for the trebling decision.

¶ 61 The majority notes that the punitive damage award in this case, even after trebling, was less than that awarded by the jury (which was reduced to an amount equivalent to the compensatory award as required by statute, *see id.* at ¶ 11). *Id.* at ¶ 48 n. 10. But the principles the majority lays down in this case will govern the trebling of punitive damages in all cases, not just those in which trebling yields an award less than that initially imposed by the jury. Because these principles do not comport with section 13–21–102, I respectfully dissent from the majority's decision to affirm the district court's trebling of punitive damages.