No. 85-246

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

WILEY H. JUEDEMAN and HAROLD JUEDEMAN,
as Personal Representatives of the
Estate of CLARICE E. JUEDEMAN, deceased,
and on their own behalf, and behalf of
all other heirs of CLARICE E. JUEDEMAN,
deceased, et al.,

                Plaintiffs and Appellants,

        -vs-

MONTANA DEACONESS MEDICAL CENTER,
a corporation,

                Defendant and Respondent.

_____

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

            Regnier, Lewis, Boland & Roberts; James M. Regnier,
            Great Falls, Montana
            Anderson, Edwards & Molloy; A. Clifford Edwards,
            Billings, Montana

     For Respondent:

            Alexander & Baucus; John D. Alexander and Neil E.
            Ugrin, Great Falls, Montana

_____

                          Submitted on Briefs: June 6, 1986

                               Decided:  October 1, 1986

Filed:  OCT 1 - 1986

                    _Ethel M. Harrison_
            _____
                          Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiffs brought a wrongful death and survivorship action against Montana Deaconess Medical Center (hospital) in the Eighth Judicial District Court for Cascade County. Following a jury trial, a verdict was returned in favor of the hospital and judgment followed. Plaintiffs appeal. We affirm.

The issues are:

1. Did the District Court err in giving a proximate cause jury instruction?

2. Did the District Court err in giving a "mere fact of injury" jury instruction?

3. Did the District Court err in giving an alternative methods jury instruction?

4. Did the District Court err in granting the hospital a protective order that prohibited deposing the hospital's nontestifying expert?

On May 26, 1981, Clarice Juedeman, age 71, had colon surgery. During surgery a catheter was inserted in her right internal jugular vein for the purposes of measuring pressure, withdrawing blood samples, and feeding and medicating her. Following the surgery she convalesced well and no longer required intravenous feeding or medication. Her attending physician, Dr. Mungas, wrote an order on June 5, 1981 to discontinue the IV. A nurse removed the IV that day. Shortly after removal, decedent lapsed into a coma. She died eleven days later.

The critical question was whether the nurse negligently removed the IV and allowed air to enter the jugular vein; and if that occurred, whether the air entered into the

2

circulatory system and ultimately plugged capillaries in the brain causing damage to the brain and coma. In medical terminology, the question was whether the removal of the IV caused an air embolism.

Because the issues require a clear understanding of the complex and contradictory testimony, we review the testimony in some detail. Plaintiff Clarene Dysart, daughter of the decedent, testified essentially as set forth in this paragraph: She and the decedent were talking in the room when Nurse Abel came in and informed the decedent that she was going to remove the catheter. Prior to the removal of the catheter, Nurse Abel brought decedent and her daughter coffee. Nurse Able hesitated when she realized she didn't know how to remove a catheter and left the room to speak with her supervising nurse. At this time, Mrs. Juedeman was sitting in a straight backed padded plastic chair. Nurse Abel returned with Celia Villanueva, her supervising nurse, who removed the IV while Mrs. Juedeman was sitting in the straight backed chair. After Nurse Villanueva dropped the catheter and left the room, Nurse Abel put gauze on Mrs. Juedeman's neck. Within 30 seconds Mrs. Juedeman experienced numbness, her eyes glazed and she started to go limp. Nurse Abel ran to get Nurse Villanueva while the daughter held her mother in the chair. When Nurse Abel returned, she attempted to administer oxygen, but had great difficulty because she was in a panic. The hospital room was in bedlam with nurses yelling at each other. Eventually a nurse and an orderly put Mrs. Juedeman back in bed. That evening after Mrs. Juedeman was removed to the intensive care unit, the daughter talked to Dr. Mungas, the attending physician. She testified that she asked, "Since it happened so soon after the removal of

3

that catheter would that have anything to do with that?" Dr. Mungas answered, "It would certainly lead you to think so, wouldn't it?"

Nurse Abel, who was the decedent's primary nurse, testified essentially as set forth in this paragraph. Because she had never removed an internal jugular vein catheter, she consulted the procedure manual, which did not offer protocol as to proper positioning of the patient. Nurse Abel then called intensive care nurses. One intensive care nurse recommended that the patient sit upright and another recommended a semi-reclined position. After she obtained gauze and neosporin, Nurse Abel asked Nurse Villanueva, her supervisor, for assistance. They went into decedent's room. Decedent was sitting in a gold cloth recliner chair and Nurse Abel reclined the chair back. Nurse Villanueva turned off the IV and clamped it down. Nurse Abel slowly removed the catheter from decedent's neck. After holding the pressure for a good minute, Nurse Abel taped the spot where the catheter had been removed. Nurse Abel then talked to the decedent for approximately seven minutes before taking the IV equipment to the medication room and getting the family coffee. When Nurse Abel returned with the coffee, decedent appeared to be in distress and said she felt numb. Nurse Abel and Nurse Villanueva put decedent in bed and oxygen was administered without difficulty. Nurse Abel could not remember if the daughter was in the room when the IV was removed or whether she helped place the decedent in the bed. Nurse Abel had worked in a hospital in California immediately prior to trial. When asked how she would remove a jugular catheter today, Nurse Abel indicated she would recline a chair at

4

approximately a 45 degree angle as she had done in California.

Nurse Villanueva testified essentially as set forth in this paragraph. When asked for assistance by Nurse Abel, she was aware Nurse Abel had consulted the procedure manual. She was not aware Nurse Abel had called the intensive care unit. When Nurse Villanueva went in the room, decedent was in a yellow or gold recliner chair, in a semi-reclined position. Nurse Villanueva shut off the IV tubing with a clamp. Nurse Villanueva then instructed Nurse Abel to remove the catheter slowly while applying moderate pressure, and after removal, to continue pressure for another minute and finish by taping the spot. Nurse Villanueva left shortly after she watched Nurse Abel perform that procedure. Approximately five minutes after Nurse Villanueva left the room, she saw Nurse Abel go inside the medication room and get a cup of coffee. The next time Nurse Villanueva saw Nurse Abel was when Nurse Abel asked her to check the decedent, about ten minutes after the removal. When Nurse Villanueva entered the decedent's room, the decedent was in distress. Both nurses tried to transfer decedent to the bed but she was too heavy and transfer was completed only after a male orderly arrived. Once transferred she was given oxygen. Nurse Villanueva testified that prior to coming to Deaconess Hospital, she had worked in a San Francisco hospital where she was specially trained as an intravenous nurse. During her six week course at the San Francisco hospital she received no instruction as to how a patient should be positioned when a jugular catheter was removed. However, during the three and a half years she was employed in California, she removed catheters about twelve times, and the patients were either stretched out on a bed,

5

in a reclined position, or sitting. Based upon her experience, she concluded that position didn't matter.

Dr. Mungas, who practiced both general and vascular surgery, testified by deposition as set forth in this paragraph. The catheter was inserted at the time of the colon surgery. Dr. Mungas ordered the catheter removed on June 5, 1981. He was called at home by one of the nurses and was informed that the decedent was having trouble. The nurse stated over the phone that Mrs. Juedeman was sitting in a chair when the nurse removed the IV; that after the IV was removed, the patient complained of feeling dizzy or weak and asked to be put back in bed and then became unresponsive. After returning to the hospital that evening, Dr. Mungas examined the patient and talked with her daughter and a nurse. His discussions led him to believe that it was not seconds but minutes after the IV was removed before the patient felt numb. Later Dr. Mungas consulted with Dr. Brenton, whose diagnosis was air embolism. Dr. Mungas questioned Dr. Brenton's diagnosis of air embolism but yielded to him as the specialist in neurology. However, after a series of tests failed to confirm Dr. Brenton's diagnosis, Dr. Mungas concluded the decedent could have died from thrombotic stroke, embolic stroke, or cardiac arrhythmia, with the most likely cause being cardiac arrhythmia. Air embolism was a very, very remote possibility. Dr. Mungas described the decedent's predisposition as follows:

> She is elderly. She is diabetic. Diabetics have accelerated development of atherosclerosis. Atherosclerosis is one of the more common causes of stroke. She has hypertension, which is one of the predisposing causes of stroke. And she has atherosclerotic heart disease manifested by a previous history of congestive heart failure. And if I remember right, she has had some problems with

6

tachycardia in the past, which is a manifestation of atherosclerotic heart disease. So all of these things I would say might predispose her to have a stroke: her age, diabetes, hypertension and heart disease.

On June 16, 1981, the date of decedent's death, Dr. Mungas wrote a letter to the Director of Nursing suggesting that a new protocol be adopted for removing a jugular catheter. Dr. Mungas recommended that central venous catheters should only be removed when a patient was in a flat position.

Mercedes Strain, Director of Nursing at the hospital in June, 1981, testified as set forth in this paragraph. On the date of the operation there was no protocol or instruction regarding the proper position of the patient when a catheter of this type was removed. Prior to receiving Dr. Mungas' letter suggesting a recumbent protocol, she was conducting an investigation regarding the position decedent was in when the catheter was removed. The investigation revealed that decedent was in a reclining chair but did not specify the position of the reclining chair. On June 19, after some research, Mercedes Strain wrote Dr. Mungas that some surgeons did not suggest positioning in a flat position, and research of medical literature was not helpful. On June 24, 1981, a protocol was distributed which suggested that as an added safety precaution to the patient before discontinuing jugular IV's the patient should be placed in bed in a recumbent or flat position.

Mary Valacich, Director of Nursing Services at the other hospital in Great Falls testified that prior to 1983 there was no written protocol as to the positioning of a patient when such a catheter was removed. However, since 1975, the policy in their hospital had been to place the patient in a flat position.

7

Dr. Brenton, who previously practiced in Great Falls as a neurologist, testified as set forth in this paragraph. He examined the patient on June 6, 1981 and his impression was that she suffered an air embolism and that this accounted for her neurological state. His diagnosis was based on the close-in-time relationship between the discontinuation of the catheter and the patient's clinical appearance. Dr. Brenton stated that an air embolism is more likely to occur if a patient is sitting upright than lying down. He pointed out that for an air embolus to occur there has to be a vacuum effect in the vein, which means a negative pressure in the vein. If a patient is sitting upright, there is the possibility of air being sucked into the vein. However, if the patient is lying down, the vein will be distended by blood and will tend to be bleeding which will not allow air to enter. He did point out that if there was an air embolus, the symptoms would be manifested in a relatively few seconds with an outside limit of one minute. Dr. Brenton admitted that his diagnosis represented a rare condition, but he stood by his diagnosis. On cross-examination, Dr. Brenton stated he was not familiar with any reported cases in medical literature which corresponded to his diagnosis. He also testified that the time between the removal of the IV and the symptoms was less than a minute, and that his understanding was that decedent was sitting upright.

Dr. Anderson, a practicing physician specializing in pulmonary and internal medicine testified that he examined decedent on June 5, 1981. His impression was that possible causes of death were carotid occlusion, cerebral embolus, thrombotic air embolus and cerebral hemorrhage. However, in his records he listed air embolus first. Dr. Anderson was

8

convinced that a patient should be in a flat position when a catheter was removed. On cross-examination, Dr. Anderson testified that the only possibility of air embolus occurring was if the defendant had anatomic malformation, and that the medical records showed no such malformation. He also testified that he had not found this type of air embolus listed in medical literature. He pointed out that decedent did suffer from atheroscopic disease and hypertension, both life threatening conditions predisposing a person to a stroke.

As demonstrated by this summary, there were conflicts in the evidence. By a vote of 8 to 4, the jury rendered a verdict for the hospital.

I

Did the District Court err in giving a proximate cause jury instruction?

The District Court gave the following instruction No. 19:

> The proximate cause of an injury is that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces the injury, and without which it would not have occurred.

Plaintiffs offered the following legal cause instruction which was refused:

> A legal cause of an injury is a cause which is a substantial factor in bringing about the injury.

On appeal plaintiffs maintain that there were two possible concurring causes which could have brought about the death of decedent: the defendant's negligence and the decedent's pre-existing condition. The hospital responds that the theories presented to the jury were entirely on a competing or alternate cause: the decedent died either from negligent

9

removal of the catheter or from a stroke caused by a pre-existing condition.

In Kyriss v. State (Mont. 1985), 707 P.2d 5, 42 St.Rep. 1487, the above legal cause instruction offered by the plaintiff was given along with additional instructions describing legal cause. In Kyriss, the plaintiff suffered from a pre-existing condition of arteriosclerosis of the blood vessels of the right leg. In the course of medical treatment following the removal of a toenail on the right leg, gangrene developed and it was necessary to amputate the lower portion of plaintiff's right leg. Citing Rudeck v. Wright (Mont. 1985), 709 P.2d 621, 628, 42 St.Rep. 1380, 1388-89, the Court stated in Kyriss:

> [I]f two or more causes concur to bring about an event, and any one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed. In such cases it is quite clear that each cause has in fact played so important a part in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all.

> The "substantial factor" rule was developed primarily for cases in which application of the "but for" rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result . . .

The Court then concluded that there were two concurring causes so that a proximate cause instruction failed to properly instruct the jury. The doctor defendants argued that the pre-existing condition of arteriosclerosis caused the condition which required the amputation. The plaintiff argued that the improper medical treatment of the infection in the leg following removal of the toenail was the cause of the condition requiring amputation. The evidence

10

demonstrated that the pre-existing condition of arteriosclerosis could have concurred with the negligent medical treatment and resulting infection in bringing about the condition requiring the amputation. The Court concluded in Kyriss that because the two causes could have concurred to bring about the injury, a proximate cause instruction was not appropriate.

The plaintiffs in the present case contend that the damage to the brain resulting from the defendant's negligence and the decedent's pre-existing condition were possible concurring causes. Our review of the record demonstrates that this is not a case in which two causes concurred or might have concurred to bring about the condition of the patient and in which either one of them operating alone would have been sufficient to cause the identical result.

The diagnosis of Dr. Brenton, neurologist, set forth the essence of plaintiffs' contentions regarding cause:

> [M]y diagnosis is that a small air embolus gained its way into her circulation, due to anatomic peculiarities on her part, found its way through the pulmonary circulation into the arterial circulation and lodged in the brain. Only perhaps five or ten milliliters of air would have been required . . .

In lay terminology the substance of the diagnosis is that a small quantity of air, approximately five or ten milliliters, entered into Mrs. Juedeman's veins; and due to an abnormality in her lung area, the air found its way through the lungs and connecting circulation into arteries and lodged in the brain. It is critical to understand that if a small quantity of air gets into the brain through an artery the effect is immediate. As further testified by Dr. Brenton:

11

Q Okay. With regard to your opinion regarding air embolus, I believe you said the effects in a situation such as the one you believe occurred with Mrs. Juedeman would be immediate. Did I understand you correctly?

A Well, they would occur within the time frame that it takes for the air to make its transit through the circulation which is going to be in a matter of seconds, you know, 30, 40, seconds, something like that, maybe less.

Q Oh, I see. In other words, is this a very, very quick happening?

A Very rapid. It's almost instantaneous, but you know, it does take a short span of time. But it's not something that's going to develop a half hour, 45 minutes later. It's going to happen right at that time.

Q Would it be in my understanding -- would it be appropriate to say that this mechanism would occur within a minute?

A I would think so. A minute would be the outside limit I would place on this sort of thing.

Plaintiffs' contention was that the hospital negligently allowed a small quantity of air to get to Mrs. Juedeman's brain. Plaintiffs maintained the damage to the brain was within a matter of seconds and in less than one minute. The hospital contends that there were no symptoms of any type for a period of seven to ten minutes, and that this proves clearly that no air ever gained access to the patient's brain. As a result, the time between the removal of the catheter and the onset of Mrs. Juedeman's symptoms became critical. As previously summarized, this time was somewhere between a few seconds and approximately ten minutes, depending upon which of the witnesses were believed. Of course, the determination of the time issue was for the jury, the trier of fact.

In Kyriss, this Court adopted the substantial factor test as it appears in the Restatement (Second) of Torts, § 431. To date, this Court has not addressed the other Restatement sections on legal cause. While it was not argued

12

by counsel, our review of the Restatement shows that § 434 is pertinent to the issue now before us. At § 434, the Restatement describes the roles of the court and the jury in the use of legal cause instructions:

> (1) It is the function of the court to determine
>      (a) whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff;
>      (b) whether the harm to the plaintiff is capable of apportionment among two or more causes; and
>      (c) the questions of causation and apportionment, in any case in which the jury may not reasonably differ.
> (2) It is the function of the jury to determine, in any case in which it may reasonably differ on the issue,
>      (a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, and
>      (b) the apportionment of the harm to two or more causes.

We adopt the law as stated in § 434 of the Restatement. We conclude that there is no evidence in the record to support the plaintiffs' argument that the hospital's negligence was a substantial cause of Mrs. Juedeman's death, along with her preexisting condition. This case is in direct contrast to Kyriss where the evidence demonstrated the presence of two causes which could have concurred in the resulting injury to the plaintiff. The District Court correctly exercised its function of making this determination and declining to offer a legal cause instruction to the jury.

We conclude that it was proper to give the proximate cause instruction in this case and to refuse the legal cause instruction.

II

Did the District Court err in giving a "mere fact of injury" jury instruction?

13

The court's Instruction No. 18 stated:

The mere fact of injury, standing alone, is not proof of negligence against the defendant in a malpractice action.

The law does not require that for every injury there must be a recovery of damages, but only imposes liability for a breach of a legal duty by the defendant proximately causing injury to the plaintiff.

Plaintiffs note that this instruction has been ruled improper in simple negligence cases. Sampson v. Snow (Mont. 1981), 632 P.2d 1122, 38 St.Rep. 1441. Plaintiffs also recognize that in a professional negligence action, the mere fact of injury instruction has been held proper. Hunsaker v. Bozeman Deaconess Foundation (1978), 179 Mont. 305, 588 P.2d 493. Plaintiffs contend Hunsaker should be overruled.

We decline to overrule Hunsaker. Here, the mere fact that the decedent lapsed into a coma within a matter of seconds or minutes after removal of the IV should not be classed as proof of negligence of itself. The instruction directed that the burden of proving the negligence of the hospital remained on the plaintiffs. We conclude that this instruction was appropriate under the facts of this case.

III

Did the District Court err in giving an alternative methods jury instruction?

The court's Instruction No. 16A stated:

The fact that other nurses might have adopted other methods does not necessarily render the attending nurse liable nor show negligence or want of skill or care. If the method adopted has substantial medical support, it is sufficient. And, where there is a difference of opinion among physicians and nurses as to the practice to be pursued in certain cases, a nurse may exercise his or her own best judgment, employing the methods his or her experience may have shown to be best, and a mere error of judgment will not make a nurse liable in

14

damages, in the absence of a showing of want of care and skill.

Plaintiffs do not dispute the use of this instruction when evidence supports alternative methods of diagnosis or treatment, but contend that the hospital's theory was not supported by medical evidence.

We will not again refer at length to the medical testimony submitted on behalf of the hospital. We point out that Nurse Abel, Nurse Villanueva, and Mercedes Strain, Director of Nursing, all testified in a manner supporting the hospital's theory. While there certainly was evidence presented to the contrary, there is substantial credible medical evidence to support the theory of the defendant. While the instruction is subject to some question because it is a comment upon the evidence, we conclude that it was not reversible error to have given the instruction.

IV

Did the District Court err in granting the hospital a protective order that prohibited deposing the hospital's nontestifying expert?

In deciding whether the case should go before the Montana Medical Legal Panel, defendants had Dr. Pratt study the records, research the case, obtain a pathologist's opinion, and prepare a report. Dr. Pratt, a nontestifying expert, made his report in anticipation of litigation. Later, a disinterment issue was presented to the court, and Dr. Pfaff filed an affidavit stating an autopsy might reveal the cause of death. When Dr. Pfaff was deposed, in response to a subpoena duces tecum, he produced Dr. Pratt's report. In substance, the report concluded that "this is an almost impossible case to defend." After reading the report,

15

plaintiffs sought to depose Dr. Pratt. The District Court granted defendants a protective order pursuant to Rule 26(b)(4)(B), M.R.Civ.P., which states:

> A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Plaintiffs contend that technical legal rules should not cloud the search for truth. Because plaintiffs do not dispute that Dr. Pratt was a nontestifying expert specially employed in anticipation of litigation, his opinions are discoverable only upon a showing of exceptional circumstances. We note that Dr. Pratt spent a sum total of 3 hours studying the records, researching the case, obtaining a pathologist's opinion and preparing the report. We find no reason to believe it was impracticable for plaintiffs to study the records, research the case, obtain a pathologist's report, and draw their own conclusions. We conclude there were no exceptional circumstances which justified ordering Dr. Pratt's deposition.

Plaintiffs also maintain that hospital waived its privilege when it presented Dr. Pratt's report to Dr. Pfaff for purposes of filing an affidavit in favor of disinterment. Waiver is the voluntary relinquishment of a known right, and response to court process does not constitute waiver. Kuiper v. Dist. Court of Eighth Judicial Dist. (Mont. 1981), 632 P.2d 694, 698, 38 St.Rep. 1288, 1292-93. Here, an intraparty communication was discovered by court process. We conclude

16

there was no waiver.  We hold the District Court did not err in granting a protective order.

We affirm.

_____
Justice

We Concur:

_____
Chief Justice

_____
_____
_____
Justices

_____
Hon. Gordon R. Bennett, District Judge,
sitting for Justice William E. Hunt

17

The Honorable Gordon R. Bennett, District Judge, sitting for Mr. Justice William E. Hunt, Sr., dissenting as follows:

Because I cannot agree with the conclusion reached as to the first question, I must respectfully dissent.

The majority opinion appears to turn on this sentence: "Our review of the record demonstrates that this is not a case in which two causes concurred or might have concurred to bring about the condition of the patient and in which either of them operating alone would have been sufficient to cause the identical result." My review of the record compels a contrary conclusion. The attending physician, Dr. Mungas, testified he believed "cardiac arrythmia" was "the most possible of all the possibilities" of the cause of injury. He elaborated by speculating that what was possible was that the cardiac arrhythmia momentarily caused deficient cardiac output which would result in inadequate cerebral perfusion. This would have occurred simultaneously or shortly after the removal of the catheter, he said. I take it this would be described as either a stroke or vascular incident. He was asked the following question by defense counsel and gave the following response:

Q    (By Mr. Ugrin)  Are there any factors in
     your general knowledge of Mrs. Juedeman that
     would predispose her or make her a high risk
     candidate for stroke or vascular incident?

A    She is elderly.  She is diabetic.  Diabetics
     have accelerated development of atherosclerosis.
     Artherosclerosis is one of the more common
     causes of stroke.  She has hypertension, which
     is one of the pre-disposing causes of stroke.
     And she has atherosclerotic heart disease
     manifested by a previous history of congestive
     heart failure.  And if I remember right, she has
     had some problems with tachycardia in the past,
     which is a manifestation of atherosclerotic
     heart disease.  So all of these things I would
     say might predispose her to having a stroke: her
     age, diabetes, hypertension and heart disease.

This testimony placed the factual question of concurrency squarely and unavoidably before the jury, regardless of whether the court chose to recognize the legal question. Apparently counsel for neither plaintiff nor defendant got around to asking any witness to reach a specific ultimate conclusion that there were or were not concurrent causes. But

18

the jury, hearing the above testimony, was most certainly entitled to consider whether the patient's predisposition might have concurred with the catheter extraction to cause the result, or whether either factor, operating alone, could have caused the result.

The plaintiff contended the negligent removal of the catheter caused the stroke and, ultimately, the death of the deceased. The defendant contended she died of old age, diabetes, atherosclerosis, hypertension and heart disease, but not the removal of the catheter. The question becomes, then, whether the advancing of discreet theories of causation should preclude consideration by the jury of concurrent causation. To require the plaintiff to plead concurrent causation at the risk of being deprived of a concurrent causation instruction would be a return to the inane nicety of common law pleading. To in effect direct the jury to ignore the testimony suggesting a possible connection between the baneful pre-existing condition and the trauma from the catheter removal is to detach the trial from reality. To prohibit the plaintiff from arguing that the concededly discreet causes contended for by the parties could have united to cause the injury forces him to present half his case to an utterly confused jury. It is such legal strangulation of common understanding that gives the law a bad name and demeans its credibility.

Under Section 434 of the Restatement of Torts, 2nd, cited in the majority opinion, the court is required to determine "whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." It is, then, the proper function of the court to decide whether to give a "substantial factor" instruction. The decision is to be made on the evidence and the facts, not on the pleadings, not on the trial format, not on the primary contentions of the parties. No estoppel on the basis of what the court may see as the primary contentions is contemplated.

19

The court is required to determine whether the <u>evidence</u> creates a causation issue upon which jurors may reasonably disagree. Certainly in this case there was evidence upon which the jury could reasonably disagree as to whether the alleged negligent catheter removal was a substantial cause of the injury (stroke) and death.

In making its decision as to whether substantial cause is an issue, the trial court should apply Section 433 of the Restatement (see comment "a" to that section). The section provides:

> The following considerations are in them-
> selves or in combination with one another
> important in determining whether the actor's
> conduct is a substantial factor in bringing
> harm to another:
> (a) the number of other factors which
> contribute in producing the harm and the
> extent of the effect which they have in
> producing it;
> (b) whether the actor's conduct has
> created a force or series of forces which are
> in continuous and active operation up to the
> time of the harm, or has created a situation
> harmless unless acted upon by other forces
> for which the actor is not responsible;
> (c) lapse of time.

Here, as to subsection (a), the number of factors, other than the catheter removal, which could have caused the harm were numerous, indeed they were detailed and vehemently argued by the defendant, as noted. It was in fact testified to and argued that these factors alone may have caused the injury. As to subsection (b), on the evidence presented, the jury could reasonably differ as to whether the defendant set in motion a force or series of forces which continued in operation up to the time of the harm and ultimately caused the harm. And certainly the lapses of time between (1) the extraction and the stroke and (2) the stroke and the death are small enough to create a clear question of concurrency. The three factors for determination of a substantial factor question mandated consideration of that question by the jury.

The "substantial factor" or "legal cause" instruction offered by plaintiff in this case should have been given, and it should have

been accompanied by Section 433 of the Restatement, or its equivalent, as set forth above, as well as by Section 432 of the Restatement, or its equivalent, which provides:

> (1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
>
> (2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

In my view none of these instructions should be given without the other. Together they provide a composite instruction to definitively guide a jury in any case where the facts will reasonably permit a conclusion that the injury was the result of concurrent causes.

Gordon R. Bennett,
District Judge, sitting for
Justice William E. Hunt, Sr.

Judge Bennett is right as rain. I wholeheartedly concur in his dissent.

Justice Frank B. Morrison, Jr.

21