2014 COA 134

Mary Catherine GASTEAZORO, BY AND THROUGH her Conservator, Janice EDER, Plaintiff–Appellant,

v.

CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a Centura Health–Penrose–St. Francis Health Services; and Leticia Overholt, M.D., Defendants–Appellees.

Court of Appeals No. 13CA0648

Colorado Court of Appeals, Div. IV.

Announced October 9, 2014

Leventhal, Brown & Puga, P.C., Jim Leventhal, Benjamin I. Sachs, Molly L. Welch, Denver, Colorado, for Plaintiff–Appellant.

Retherford, Mullen & Moore, LLC, J. Stephen Mullen, Anthony D. Moore, Kimberly F. Wells DeLine, Colorado Springs, Colorado, for Defendant–Appellee Catholic Health Initiatives.

Stinnett & Masters LLP, Mark A. Stinnett, Margaret N. Masters, Colorado Springs, Colorado, for Defendant–Appellee Leticia Overholt, M.D.

Opinion by JUDGE WEBB

¶ 1 This medical negligence case raises a novel question in Colorado—may nurses be included in a jury instruction derived from the pattern exercise-of-judgment instruction given concerning physicians? Here, after having been so instructed, a jury returned a verdict against plaintiff, Mary Catherine Gasteazoro, and in favor of defendants, Catholic Health Initiatives Colorado, d/b/a Centura Health–Penrose–St Francis Health Services (the hospital), and Leticia Overholt, M.D. (Dr. Overholt). We conclude that the trial court acted within its discretion by instructing the jury, as to the claim against the hospital for the alleged negligence of its nurses, "An exercise of judgment that results in an unsuccessful outcome does not, by itself, mean that a physician or nurse was negligent." We further conclude that the court did not err in overruling plaintiff's objections to expert testimony from a neurosurgeon as violating a stipulation or improperly opining on the standard of care for a specialist in emergency medicine. Therefore, we affirm.

## I. Facts

¶ 2 When plaintiff arrived at the hospital's emergency department, nurse Yerger saw her first. Plaintiff presented with complaints of headache, nausea, dizziness, and neck pain. Her vital signs included high blood pressure and low blood oxygen saturation. Dr. Overholt, who was practicing as a specialist in emergency medicine, evaluated her, diagnosed a cervical sprain, and ordered her discharged. The doctor did not order an MRI, a CT scan, or any other tests. Nurse Scolardi processed the discharge, although plaintiff's blood pressure remained elevated.

¶ 3 Ten days later, plaintiff was found in her home, unresponsive. She had suffered a hemorrhagic stroke resulting from a ruptured aneurysm in her brain. The stroke caused serious injuries.

¶ 4 Plaintiff alleges that her treatment in the emergency department was below the standard of care in three ways.

- Nurse Yerger did not properly triage her,

- Dr. Overholt failed to recognize that her symptoms were consistent with an impending cerebral vascular incident (CVA) and did not order tests that would have detected a CVA or aneurysm.

- Nurse Scolardi did not follow the hospital's policies in discharging her despite unstable vital signs, rather than acting as her advocate by challenging the discharge order.

## II. The Trial Court Did Not Err by Including Nurses in the Error-in-Judgment Jury Instruction

### A. Preservation and Standard of Review

■ ¶ 5 The hospital disputes preservation because on appeal plaintiff argues against the instruction based on Colorado law dealing with physicians, while below plaintiff did so based on lack of evidence. True, during the instruction conference, plaintiff's counsel did not cite any authority. But this issue has not been decided in Colorado.

¶ 6 During the instruction conference, hospital counsel acknowledged plaintiff's concern "that nurses don't actually exercise judgment," which had been the basis of plaintiff's written objection ("a nurse cannot exercise judgment in there for [sic] this sentence is inapplicable"). Still, counsel argued for a professional judgment instruction that included nurses patterned after CJI–Civ. 4th 15:4 (2011). Counsel explained that in "notes on use for the 15:27, it specifically states that the 15:4 applies not only to physicians, but also other health care practitioners or practitioners of other healing arts."

¶ 7 Plaintiff's counsel responded that "unsuccessful outcome doesn't apply to a nurse," "a nurse doesn't come to her own diagnosis of a problem," and "exercise of judgment is not part of what a nurse can do."

¶ 8 Then the trial court engaged both counsel in a discussion of this instruction. It concluded that adding "nurse" to an instruction derived from CJI–Civ. 15:4 would obviate giving an instruction derived from CJI–Civ. 4th 15:27 (2011).[1]

¶ 9 For these reasons, we conclude that plaintiff preserved the issue whether an instruction based on CJI–Civ. 15:4 can include nurses. *See Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788, 799 (Colo. 1991).

■ ¶ 10 A trial court must instruct the jury correctly on all matters of law. *See, e.g., Steward Software Co. v. Kopcho*, 266 P.3d 1085, 1087 (Colo. 2011). Whether a trial

court's instructions correctly state the law is reviewed de novo. *See, e.g., Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). But where the instructions correctly inform the jury of the law, "a trial court has broad discretion to determine the form and style of jury instructions." *Id.* Such a decision as to a particular instruction will be upheld unless it "is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law." *McLaughlin v. BNSF Ry. Co.*, 2012 COA 92, ¶ 30, 300 P.3d 925.

¶ 11 Under this standard, "[i]t is not necessary that we agree with the trial court's decision." *Gen. Steel Domestic Sales, LLC v. Bacheller*, 2012 CO 68, ¶ 42, 291 P.3d 1 (internal quotation marks omitted). An appellate court should affirm so long as the trial court's decision does not "exceed the bounds of the rationally available choices." *Id.* (internal quotation marks and alteration omitted). And the appellate court may affirm the decision "on any grounds supported by the record." *McLaughlin*, ¶ 30.

■ ¶ 12 In a civil case, a properly preserved objection to a particular instruction is subject to the harmless error rule. *See, e.g., Harner v. Chapman*, 2012 COA 218, ¶ 25. This rule permits reversal only if a jury "probably would have decided a case differently if given a correct instruction." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009).

### B. Background

¶ 13 The disputed instruction provided:

A physician or nurse does not guarantee or promise a successful outcome by simply treating or agreeing to treat a patient. An unsuccessful outcome does not, by itself, mean that a physician or nurse was negligent. An exercise of judgment that results in an unsuccessful outcome does not, by itself, mean that a physician or nurse was negligent.

As relevant here, this instruction differs from CJI–Civ. 15:4 by including "or nurse." The

---

1. CJI–Civ. 4th 15:27 (2011), entitled "No Implied Warranty of Successful Outcome—Other Professionals," also includes the sentence: "An exer- cise of judgment that results in an unsuccessful outcome does not, by itself, mean that [a] [an] _____ was negligent."

court also gave the following stipulated instruction, based on CJI–Civ. 4th 15:26 (2011):

> A nurse or hospital is negligent when the nurse does an act that reasonably careful nurses would not do or fails to do an act that reasonably careful nurses would do. To determine whether a nurse's conduct was negligent, you must compare that conduct with what a nurse having and using the knowledge and skill of nurses practicing in the same field of practice, at the same time, would or would not have done, under the same or similar circumstances.

### C. Law

#### 1. Colorado

¶ 14 Initially, plaintiff argues that because under C.R.C.P. 51.1(1), a trial court "shall use such instructions as are contained in Colorado Jury Instruction (CJI) as are applicable to the evidence and the prevailing law," the mere existence of CJI–Civ. 15:4 forecloses a modified version including nurses. This argument is unpersuasive, for two reasons.

¶ 15 First, a trial court may depart from CJI where "the factual situation or changes in the law warrant a departure from the CJI instructions." C.R.C.P. 51.1(2). Departure must be an option because CJI does not "cover every possible legal principle which may be applicable in a given case." *Fed. Ins. Co. v. Pub. Serv. Co.*, 194 Colo. 107, 110, 570 P.2d 239, 241 (1977); *see Short v. Kinkade*, 685 P.2d 210, 211 (Colo. App. 1983) (reversing trial court's refusal to modify pattern instruction, although absence of Colorado precedent required that prevailing law be derived from secondary authority).

¶ 16 Second, Notes on Use 2 for CJI–Civ. 15:2 says in part: "This instruction is generally applicable to members of other healing arts." And Notes on Use 1 to CJI–Civ. 15:4 cross references the Notes on Use for CJI–Civ. 15:1 and 15:2. Still, no Colorado case has addressed the propriety of this instruction other than in a malpractice claim against a physician.

¶ 17 Contrary to the hospital's argument, the references to "other healing arts" does not alone show that the instruction was proper. Notes on Use 2 for CJI–Civ. 15:2 lists as professionals "surgeon," "dentist," and "chiropractor," but not "nurse." And in any event, "notes contained in CJI are not law." *Krueger v. Ary*, 220 P.3d 923, 928 (Colo. App. 2007).

¶ 18 Nor is the exercise-of-judgment sentence in CJI–Civ 15:27 determinative. This instruction refers to "other professionals." The Source and Authority comment says that this instruction "sets out the same principles that are applicable to physicians and practitioners of other healing arts." Thus, if a nurse was not within the "other healing arts" category, the nurse would not be entitled to an exercise-of-judgment instruction as an "other professional." *Cf. Fiscus v. Liberty Mortg. Corp.*, 2014 COA 79, ¶ 28, 373 P.3d 644 ("[S]pecific terms prevail over general terms.").

¶ 19 For these reasons, the parties' arguments based on CJI–Civ. are not dispositive.

¶ 20 Next, plaintiff argues that although no Colorado case addresses whether a nurse should be included in a professional judgment instruction, decisions explaining why the instruction is proper for physicians, such as *Day*, 255 P.3d 1064, weigh against giving such an instruction.

¶ 21 In *Day*, a malpractice case against a physician, the court rejected an argument that the last sentence of CJI–Civ. 15:4—"[a]n exercise of judgment that results in an unsuccessful outcome does not, by itself, mean that a physician was negligent"—should be abandoned. *See also Schuessler v. Wolter*, 2012 COA 86, ¶ 14, 310 P.3d 151 ("The pattern instruction is based on a fundamental tenet of tort law, which is that the mere occurrence of an injury or accident, in and of itself, does not mean that the injury was the result of negligence.").

¶ 22 These cases rest on the nature of the physician-patient relationship. True, the nurse-patient relationship does not include the same attributes. But possible application of the instruction to nurses or other health care professionals was not before the courts in either *Day* or *Schuessler*.

¶ 23 The hospital emphasizes the statement in *Kibler v. State,* 718 P.2d 531, 534–35 (Colo. 1986), that "[i]n the case of a medical professional, such as a nurse, compliance with 'generally accepted standards' requires the person to exercise that degree of knowledge, skill, and care exercised by other like professionals in the same or a similar community.'" But *Kibler* involved a license revocation.[2]

¶ 24 For these reasons, law outside of Colorado may be considered. *People v. Weiss,* 133 P.3d 1180, 1187 (Colo. 2006) ("Although not binding as precedent, we may look to decisions of other jurisdictions for persuasive guidance on matters that are of first impression to us.").

### 2. Other Jurisdictions

¶ 25 Plaintiff relies on three out-of-state cases:

- *Adams v. Cooper Hosp.,* 295 N.J.Super. 5, 684 A.2d 506, 508 (App.Div.1996), upheld refusal to give an exercise-of-judgment instruction, explaining that while a physician may face a Hobson's choice when either of two treatment courses "has substantial support as proper practice by the medical profession," as to the claim against the nurse, "no such choicelessness existed. The issue before the jury was whether [the registered nurse] had the duty to constantly monitor her patient, the plaintiff, during the time she was in charge of his care."

- *Veliz v. Am. Hosp., Inc.,* 414 So.2d 226, 227–28 (Fla.Dist.Ct.App.1982), disapproved of an "honest errors of judgment" instruction because, when given along with a reasonable care instruction, "the jury could have found the defendant not liable because it believed the nurse on duty made an honest mistake of judgment while at the same time it also could

have believed her conduct constituted a clear departure from the required standard of care."

- *Parodi v. Washoe Med. Ctr., Inc.,* 111 Nev. 365, 892 P.2d 588, 591 (1995), disapproved of an instruction that "a nurse is not negligent if, in exercising her best judgment, she selects one of the approved methods, which later turns out to be a wrong selection." The court ruled broadly, "agree[ing] with the growing number of courts that have rejected the error-in-judgment instruction." *Id.*

¶ 26 Although the hospital does not cite any out-of-state authority, some courts have upheld professional judgment instructions in cases against nurses.

¶ 27 For example, in *Gerard v. Sacred Heart Med. Ctr.,* 86 Wash.App. 387, 937 P.2d 1104, 1105 (1997), the court recognized that "medicine is an inexact science where the desired results cannot be guaranteed, and where professional judgment may reasonably differ as to what constitutes proper treatment." (Internal quotation marks omitted.) It explained that a professional judgment instruction is appropriate when, in arriving at a judgment, a health care provider "exercised reasonable care and skill within the standard of care he was obliged to follow," and "was confronted with a choice among competing therapeutic techniques or among medical diagnoses." *Id.* The court held that such an instruction was proper because "the decision to restrain a patient is a nursing judgment," which involves assessing the "patient's behavior, ... the cause of the patient's discomfort, review of the patient's medication, the patient's need to be ambulatory, and the physician's orders." *Id.; see also Juedeman v. Mont. Deaconess Med. Ctr.,* 223 Mont. 311, 726 P.2d 301, 307 (1986) (Different expert testimony on how intravenous tube should have been removed sup-

---

2. Some Colorado statutes have described nurses as being in the category "medical professional." § 13–21–117, C.R.S.2014 ("[A] physician, social worker, psychiatric nurse, psychologist, or other mental health professional ...."); § 17–1–113(2), C.R.S. 2014 (Department of Corrections shall assess copayments "for every inmate-initiated request for medical or mental health services provided to the inmate by a physician,

physician's assistant, nurse practitioner, registered nurse, or licensed practical nurse," whether such medical professional is institutional or noninstitutional.); *see also* § 12–38–103(5), C.R.S. 2014 ("Diagnosing ... means the use of professional nursing knowledge and skills."); § 12–38–103(10) ("Practice of professional nursing means ... using specialized knowledge, judgment, and skill.").

ported instruction that "a mere error of judgment will not make a nurse liable in damages, in the absence of a showing of want of care and skill.").

¶ 28 Similarly, in *Fraijo v. Hartland Hosp.*, 99 Cal.App.3d 331, 160 Cal.Rptr. 246, 252 (1979), the court recognized that nurses "are held to strict professional standards of knowledge and performance," and physicians "have long relied on nurses to exercise independent judgment in many situations." It concluded that a professional judgment instruction is proper where "standard medical practice permits physicians to confer upon nurses in certain medical situations the exercise of independent judgment." *Id.*[3]

## D. Discussion

¶ 29 In the absence of definitive Colorado authority, the propriety of the disputed instruction presents a close question, whether viewed from the perspective of out-of-state authority or the particular factual record. To begin, out-of-state authority is not dispositive, for three reasons.

¶ 30 First, *Veliz*, 414 So.2d at 227, involved an "*honest* errors of judgment" instruction, and *Parodi*, 892 P.2d at 591, involved an "exercising her *best* judgment" instruction. Many courts have disapproved of such instructions, not because they recognize that health care providers exercise judgment but because "terms such as 'good faith,' 'honest,' and 'bona fide,' could lead the jury to believe that, to find the defendant negligent, the plaintiff must prove bad faith, dishonesty, or fraud." *Morlino v. Med. Ctr. of Ocean Cnty.*, 152 N.J. 563, 706 A.2d 721, 733 (N.J. 1998). The exercise-of-judgment instruction given here did not include any such terms.

¶ 31 Second, many cases have cited *Veliz* with approval in rejecting *all* professional judgment instructions. *See, e.g., Pleasants v. Alliance Corp.*, 209 W.Va. 39, 543 S.E.2d 320, 331 n. 27 (W.Va. 2000) (collecting cases). *Day*, 255 P.3d at 1071, expressly forecloses this approach.

¶ 32 Third, even assuming that the exercise-of-judgment instruction is appropriate

for claims against nurses arising from their acts or omissions involving "a nursing judgment," *Gerard*, 937 P.2d, at 1105, plaintiff's opening brief neither argues nor provides citations to testimony showing that the nurses' acts or omissions at issue were outside the range of any such judgment. *See, e.g., In re Estate of Hope*, 223 P.3d 119, 121 (Colo. App. 2007) (declining to take up skeletal argument unsupported by record references).

¶ 33 To the extent plaintiff suggests that giving the exercise-of-judgment instruction along with a separate standard of care instruction, as occurred here, creates an unacceptable potential for jury confusion, plaintiff did not make that argument below; she raises it on appeal for the first time in her reply brief. *See Saint John's Church in Wilderness v. Scott*, 2012 COA 72, ¶ 9 n. 3, 296 P.3d 273 ("[W]e will not consider arguments raised for the first time in a reply brief."). In any event, this notion is also, at least impliedly, foreclosed by *Day*, which reasoned that "CJI–Civ. 15:4, when given in conjunction with an elemental negligence instruction and a standard of care instruction as recommended in the model instructions' Notes on Use, informs the jury that a physician may be held liable for an exercise of judgment, but only when his judgment deviates from the objective standard of care." 255 P.3d at 1072 (footnote omitted).

¶ 34 Nor is the factual record conclusive. On the one hand, plaintiff fails to identify any expert testimony that the nursing activities at issue did not require some exercise of judgment. But on the other hand, the hospital's nursing standard-of-care expert witness did not opine that either nurse was exercising a nursing judgment.

¶ 35 Under these circumstances, we conclude that the trial court did not abuse its broad discretion by including nurses in the exercise-of-judgment instruction, for following reasons:

- The question is unresolved in Colorado cases. *See Jimenez v. Rodriguez–Pagan*, 597 F.3d 18, 26 (1st Cir. 2010) ("It is hard to say that the district court abused

---

**3.** Plaintiff concedes that this instruction may be appropriate in such situations, but correctly

notes that the record does not show any delegation.

its discretion when the ostensible abuse is a matter of unsettled law.").

- Language in CJI–Civ. supports extending the instruction to health care professionals other than physicians.
- One Colorado case and several statutes classify nurses as medical professionals.
- The hospital's policy vesting nurses with the prerogative of challenging a physician's order refers to "good clinical judgment" in carrying out "authorized physician orders."

III. The Trial Court Did Not Err in Overruling Plaintiff's Objection to Testimony from Dr. Overholt's Neurosurgery Expert.

A. Standard of Review

¶ 36 "The trial court has broad discretion in determining both the qualification of expert witnesses, and the scope of expert testimony." *Boettcher DTC Bldg. Joint Venture v. Falcon Ventures*, 762 P.2d 788, 791 (Colo. App. 1988) (citation omitted). "A court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair." *McLaughlin*, ¶ 10.

¶ 37 "Courts should give effect to stipulations." *Maloney v. Brassfield*, 251 P.3d 1097, 1108 (Colo. App. 2010). But "if there is a sound reason in law or equity for avoiding or repudiating a stipulation, a party is entitled to be relieved from its requirements upon timely application." *Lake Meredith Reservoir Co. v. Amity Mut. Irrigation Co.*, 698 P.2d 1340, 1346 (Colo. 1985). The trial court has discretion to relieve a party of a stipulation. *Id.*

¶ 38 "[A] physician who holds himself or herself out as a specialist in a particular field of medicine is measured against a standard commensurate with that of a reasonable physician practicing in that specialty." *Jordan v. Bogner*, 844 P.2d 664, 666 (Colo. 1993). The applicable standard of care is "what a reasonable physician certified in that specialty would do under similar circumstances." *Hall v. Frankel*, 190 P.3d 852, 858 (Colo. App. 2008).

¶ 39 Consistent with the higher standards applicable to such specialists, "[e]xpert witnesses must then be qualified in the specialty at issue to testify as to the higher standard of care for that specialty." *Id.* A trial court "shall not permit an expert in one medical subspecialty to testify against a physician in another medical subspecialty unless, in addition to such a showing of substantial familiarity, there is a showing that the standards of care and practice in the two fields are similar." § 13–64–401, C.R.S. 2014. For example, a specialist in internal medicine could not testify to the standard of care for a general surgeon. *Connelly v. Kortz*, 689 P.2d 728, 729 (Colo. App. 1984).

B. Background

¶ 40 Before trial, plaintiff's counsel told counsel to Dr. Overholt that he would move to strike several opinions set forth in the expert disclosure for Dr. Shogan, a board certified neurosurgeon. Dr. Overholt's counsel responded that the following disclosed opinions would not be elicited from Dr. Shogan:

- when plaintiff presented to the hospital's emergency room, a neurologic consult was not required or necessary;
- based on her presentation, neurologic testing, such as a CT, an MRI, or a lumbar puncture, was not indicated; and
- physicians must use judgment and reason based on the patient's presentation in determining whether testing or consults are required.

Even so, plaintiff moved to strike. The trial court held a hearing and denied the motion.

¶ 41 The next day, plaintiff's counsel made an additional record, pointing out that during Dr. Shogan's deposition, he had refused to answer questions about an emergency room physician's standard of care. Dr. Overholt's counsel responded:

We can short-circuit this. I'm not going to ask him about the stuff. I looked at it again last night. We're not going to bring it up with him on the MRI issue.

After the court expressed some uncertainty over what had been argued earlier, Dr. Overholt's counsel continued:

That was the motion with respect to that opinion about the CT, MRI specifically, which is the one we were having most of our debate about yesterday, whether a CT or MRI was indicated or required to be done. We are not going to ask Dr. Shogan that question.

¶ 42 During plaintiff's case in chief, Dr. Horowitz, her neurosurgery expert, testified that plaintiff's presentation in the emergency department indicated a brain bleed, also known as a sentinel bleed. After describing her presentation in the context of various risk factors, he opined:

> So putting together her demographics, her past medical history, and her signs and symptoms, all point to bleeding in the head. At that point—at that point when the patient had presented, you wouldn't know what the bleeding was from. You would do a CAT scan.

After the court overruled an objection, Dr. Horowitz continued:

> At that point, you just get a CAT scan, and then looking at the CAT scan, by the pattern of blood, that would then help you determine what had bled, what the source of the bleeding was.

However, the witness clarified that he was not commenting on "whether an emergency room doctor was required to get a CAT scan or not by the standard of care."

¶ 43 During the defense case, when Dr. Overholt called Dr. Shogan, plaintiff's counsel conducted voir dire, establishing that Dr. Shogan had not worked as an emergency room physician for over thirty years and had not done "any specific medical research in emergency medicine on what the standard of care would require in this case." "With this proviso," plaintiff's counsel did not object "to him being qualified to testify in the field of neurosurgery."

¶ 44 Like Dr. Horowitz had done, Dr. Shogan reviewed plaintiff's presentation at the emergency department and described possible signs of a brain bleed. Then he was asked:

> [H]ave you formed an opinion about the likelihood of whether or not looking prospectively, whether or not [plaintiff's] pres-

entation ... indicated that she might be having a sentinel bleed or a warning bleed from an aneurism?

Plaintiff's counsel objected and asked to approach the bench.

¶ 45 At the ensuing conference, plaintiff's counsel argued that the qualification ("prospectively") made the question "a back doorway [sic] of getting in that standard of care opinion which he specifically told the court he was not going to do," which was beyond the witness' specialty. The court indicated that it had already ruled, but gave plaintiff a standing objection. Then plaintiff's counsel reminded the court that Dr. Overholt's counsel had agreed, "I'm only going to ask him about the CT and the scans [sic]." Dr. Overholt's counsel replied that he "was not going to ask him about the CT and the scans." The court reiterated that it would allow the pending question.

¶ 46 After the bench conference, Dr. Shogan was asked:

> [B]ased on the medical records that you've reviewed of the patient's presentation in the emergency department ... as to whether or not in reasonable probability, [plaintiff] appeared to be a patient having a sentinel bleed or a warning bleed from an aneurism at that time?

The doctor responded in the negative and expressed disagreement with Dr. Horowitz's contrary opinion. He explained:

> It's primarily based on the history and physical examination which was obtained at the time, and the history which [plaintiff] gave was not really consistent with a sentinel bled, and her physical examination also seemed to be inconsistent with a sentinel bleed. And so overall, I would think that a physician evaluating her at that time would not come to the conclusion that she had had a sentinel bleed.

Plaintiff's counsel renewed his objection, which the court again overruled. Dr. Shogan then explained the basis for his opinions by applying his experience and medical literature to plaintiff's presentation, history, and examination.

## C. Discussion

¶ 47 Plaintiff asserts that the objected-to testimony was contrary to the prior agreement of Dr. Overholt's counsel, and that this testimony constituted an improper opinion on an emergency room physician's standard of care, which was beyond Dr. Shogan's specialty. Dr. Overholt denies both assertions and also argues that by eliciting similar testimony from Dr. Horowitz, plaintiff opened the door, affording the trial court discretion to relieve Dr. Overholt of any contrary stipulation. Because we reject both of plaintiff's assertions, we do not address whether she opened the door to this testimony.

### 1. Stipulation

¶ 48 Plaintiff's assertion that the objected-to testimony violated an agreement or stipulation of Dr. Overholt's counsel fails, for two reasons.

¶ 49 First, as to the email exchange before plaintiff moved to strike, plaintiff's counsel did not direct the trial court's attention to these emails during the testimony of Dr. Shogan. Further, the three disclosed opinions—set out specifically above—that Dr. Overholt's counsel renounced do not encompass the testimony to which plaintiff objected.

¶ 50 Second, as to the colloquy when plaintiff's counsel sought to complete the record on the motion, Dr. Overholt's counsel only agreed not to "bring it up with him on the MRI issue." Counsel clarified the statement, "I'm not going to ask him about the stuff," by adding, "the motion with respect to that opinion about the CT, MRI specifically, which is the one we were having most of our debate about yesterday." Nor did Dr. Shogan express any such opinion.

### 2. Scope of Dr. Shogan's Testimony

¶ 51 Plaintiff asserts that while Dr. Shogan "did not intone the words, 'standard of care,'" his opinions were "a back-door attempt to elicit standard of care opinions from an unqualified expert witness." This assertion ignores the nexus between his specialty and the diagnostic significance of plaintiff's presentation and history. It also implies that a specialist in emergency medicine should assess this diagnostic information differently, but does not explain why this is so.

¶ 52 Dr. Shogan confirmed his familiarity with both "the condition known in medicine as a sentinel bleed or a warning bleed for an aneurism in the brain," and "the signs and symptoms of patients who have all those." Then he opined that, "to a reasonable degree of medical probability it would be my feeling that she was not having a sentinel bleed" when she presented in the emergency department. He based this opinion on her history, which "was not really consistent with a sentinel bleed," and her physical examination, which "also seemed to be inconsistent with a sentinel bleed." He explained,

> the history seemed to be that [plaintiff] had been shoveling snow and over a couple of days had developed pain in her neck after shoveling snow and subsequently also developed some headache and other symptoms, but primarily had related this to the snow shoveling, and her physical examination seemed to be more consistent with pain that was present in the muscles of her neck and les consistent with something that was going on inside the brain itself.

¶ 53 Next, Dr. Shogan discounted plaintiff's age, hypertension, and smoking as significant risk factors that would cause an aneurysm to bleed. He conceded that her complaints of neck pain, headaches, and nausea could be symptoms of a brain bleed, but offered that other causes were "much more likely in this type of a presentation." Based on his experience and the medical literature, he explained that the location of plaintiff's pain, her reports of muscle spasms, and her sensations of radiating pain were not consistent with a brain bleed.

¶ 54 Then he contrasted her presentation with classical symptoms of a brain bleed, such as "the worst headache someone has ever had in their life" and extreme light sensitivity. He also discounted plaintiff's high blood pressure in the emergency department as a sign of a sentinel bleed, noting that she had a history of high blood pressure, which could have been elevated by "musculoskeletal strain or sprain."

¶ 55 Thus, "[t]aken as a whole," Dr. Shogan's testimony, "showed that he was familiar with the field." *Sanchez v. Lauffenburger*, 784 P.2d 855, 857 (Colo. App. 1989). "[I]n light of the totality" of this testimony, *id.* Dr. Shogan properly analyzed plaintiff's presentation and history as they related to his specialty, and offered opinions within that specialty concerning the likelihood that she was experiencing a sentinel bleed when she appeared in the emergency department. Therefore, the trial court did not abuse its discretion in overruling plaintiff's objections.

## IV.   Conclusion

¶ 56 The judgment is affirmed.

JUDGE FURMAN and JUDGE NAVARRO concur.